WM. E. HAXTON v. M. R. HARRIS, *County Treasurer, &c.*

1. COUNTY TREASURER, *Not to Purchase at Tax Sale.* A county treasurer cannot, either directly or indirectly, become a purchaser at a tax sale conducted by himself.

2. ———— *Lien for Taxes.* Such a purchase, if attempted, is invalid, and the sale may be set aside at the instance of the owner; but such invalid sale does not in the absence of express statutory authority operate as a payment of the taxes and a discharge of the tax-lien upon the property.

3. ———— *Forfeiture of Money, Illegally Paid.* The treasurer has no claim for the money paid into the treasury on such attempted purchase, but the money so paid is forfeited to the public for the benefit of the public, and not to the lot-owner, or for his individual benefit.

*Error from Franklin District Court.*

INJUNCTION, brought by *Haxton* to restrain *Harris* as county treasurer from selling six certain city lots for unpaid taxes. The *Board of County Commissioners* of Franklin county was joined as a co-defendant. *Haxton* purchased the lands from one Daniel Baldwin, the former owner, in March 1875. The taxes for the alleged non-payment of which the county treasurer had advertised the lands for sale were those assessed in and for the years 1872 and 1873. A former county treasurer in 1873 had illegally withheld the lands from tax sale, and had illegally issued a pretended tax-sale certificate to one Fisk for the taxes of 1872, which sale-certificate in 1874, in an action wherein said Baldwin was plaintiff and said Fisk and others were defendants, was by the district court adjudged void, and its surrender and cancellation ordered. Other facts appear in the opinion, *infra*. The district court, at the March Term 1876, refused the injunction prayed for, and *Haxton*, plaintiff, brings the case here on error.

*Benson & Parkinson,* and *McClure & Humphrey,* for plaintiff.

*H. C. Mechem,* for defendants.

The opinion of the court was delivered by

BREWER, J.: The facts in this case are briefly these: In 1872 the taxes on the lots described in the petition were not paid. Upon the record it appeared that at the sale in 1873, for non-payment of such taxes, the lots were sold to one Calvin Fisk, and the certificate of sale issued to him, and by him indorsed. The taxes of 1873 were afterward charged up on the sale-certificate. As a matter of fact, Fisk did not buy, had no interest in the sale-certificate, and indorsed it merely as a matter of accommodation, and the issue of the certificate was merely a cover for a private speculation of the treasurer, who was the party actually paying the money into the treasury. In 1874 certain proceedings were had, in which, at the instance of the then owner of · the lots, the sale-certificate was adjudged void. In August 1875, on return of such certificate the money was refunded by the then treasurer. Such treasurer was in 1873 the deputy of the treasurer who engaged in this speculation, and the party who conducted the business of the office, and therefore cognizant of the facts of the speculation. In March 1875 the plaintiff became the owner of the lots by purchase. In July 1875, the treasurer advertised these lots for sale (to be sold 7th September 1875) as lots which the treasurer had unavoidably omitted or failed to sell at prior tax sales. The plaintiff thereupon brought this action to restrain such sale. The district court decided against him, and he now brings the ruling here for review.

Two things are clear, first, that the owner of the lots has never paid the taxes of 1872 and 1873; and second, that the treasurer took nothing by his attempted purchase. It is generally true, that one cannot be seller and buyer at the same time. "No man can serve two masters." And a treasurer cannot be a purchaser either directly or indirectly at tax sales conducted by himself. (Cooley on Taxation, 341, and cases cited.) The difficult question is: To what extent may the owner profit by

*Statement of facts.*

*1. County treasurer cannot purchase at tax sale.*

the treasurer's wrong?   The plaintiff contends that the treasurer not only takes nothing by his attempted purchase, but also forfeits the money he paid on such purchase, and that he, the owner, has a right to have the money paid as purchase-money appropriated to the satisfaction and payment of his taxes; in other words, that the treasurer's wrong should inure, not to the benefit of the public, but to that of himself, the lot-owner.   But how has the wrong of the treasurer injured the lot-owner?   If he had paid the taxes at the time they were due, no sale would have been attempted.   His default made the opportunity.   Being in default, a sale was imperative.   If the treasurer had not ventured on this speculation, a sale would have been had to an individual, or to the county, and in either event interest would have begun to run on the taxes.   But the sale to the treasurer being void, no interest has run on the delinquent taxes, and to that extent at least the lot-owner has been benefited by the wrongful conduct of the treasurer.   The burden of taxes was never made larger by anything the treasurer did.   It may be said that, possibly at the sale, if open and free, some one might have bid less than the entire property.   This is doubtless true, and therefore the lot-owner is wronged, and the sale void.   But in fact such a result seldom if ever happens at our tax sales, and if it did, in no way is the amount of the tax reduced.   And is not the wrong fully remedied so far as the lot-owner is concerned when the sale is set aside?   He has the same opportunity for payment of his taxes, without interest or costs, as before the attempted purchase.   If he fails still to pay, and the lot is again sold, he has the same length of time in which to redeem that he would have had if the first sale had been valid.   He stands in all respects, and as to all rights and liabilities, as he stood at the time of such illegal purchase.   Wherein then has he, more than any other individual, special claim to appropriate the money wrongfully paid by the treasurer into the county funds?   Unquestionably that money so paid by the treasurer is forfeited.   He cannot recover it from the county, and the sub-

sequent payment in this case by the present treasurer was without warrant of law.   But if forfeited, why not forfeited to the benefit of the entire public?   As a general rule, forfeitures inure to the benefit either of the public, or of the party in whose hands the thing forfeited is at the time of the forfeiture; and in this case that was the county.

Again, at the time of the attempted sale the county had a lien for taxes.   The treasurer paid so much for the purpose

2. Lien on lands for taxes.

of purchasing that lien.   Public policy forbade such a sale; the lien never passed to the treasurer.   Did it not remain with the county? and why cannot the county still enforce it against the property?   Grant, that by reason of the wrong the law will never aid the treasurer in recovering the money, and that the county may claim it as forfeited: by what right does the lot-owner claim that it is forfeited for his benefit any more than for the benefit of all the tax-payers?   Does not the ordinary rule of sales obtain, that where an attempted sale fails the purchaser may recover the consideration, or the seller retains it because the law will not help the wrongdoer?   And if the seller retains it, he does so as his own property, and not as that of some third party.

Still again: There was no payment of taxes in the strict sense of the term.   The treasurer attempted to buy a tax-lien from the county.   He never assumed to act as the agent of the owner, or to discharge the obligations of the property for the taxes.   His purchase failed; but in the absence of

3. Forfeiture of money illegally paid as taxes.

express statutory authority can anything more be said than that the purchase failed?   By failing to purchase, does he become an agent to pay? A. attempts to purchase of B. a mortgage-lien which the latter holds on the property of C.   For want of authority his purchase fails.   Is the mortgage paid? or does it still remain in B.'s hands?   And by what right can the courts consider A. an agent of C., and his attempted purchase for his own benefit a payment of the lien for C.'s benefit? *Everett v. Beebe,* 37 Iowa, 452, is a case somewhat in point.

That was an action by the owner against the holder of a tax deed. The deed was held invalid, upon the same principle that the sale herein was adjudged void, because the treasurer was interested in the purchase at the tax sale; yet the owner was required to pay the holder of the tax deed the amount he would have had to pay the county in the first instance, that is, the taxes, without interest or costs. Though the sale was invalid because the treasurer could not directly or indirectly purchase, yet the wrongful act of the treasurer in the sale did not operate in behalf of the owner to pay the taxes. The same principle controls this case. The tax-lien in behalf of the county has not been destroyed, and the taxes have not been paid, and are a valid charge against the property.

This disposes of the case, and compels an affirmance of the judgment.

VALENTINE, J., concurring.

HORTON, C. J.: I cannot concur in the opinion of the court, and shall briefly give my reasons therefor. From the record, these facts, uncontradicted, appear: J. P. Harris was the county treasurer of Franklin county in 1872 and 1873, and until July 1874. Milo R. Harris, one of the defendants in error, was his deputy. The taxes on the lots in controversy for 1872 were not paid at the tax sales of May 1873, and were then delinquent; the lots were duly advertised to be sold at that time for the taxes, but were not sold or offered for sale. After these tax sales were adjourned, the deputy treasurer made out a certificate of sale of the premises to one Calvin Fisk, without Fisk's knowledge, and in his absence. In the winter of 1873-4, J. P. Harris had Mr. Fisk indorse in blank this tax certificate, with a number of others. At the tax sales of 1874, G. W. Hamblin, who was present to bid on this property, asked the deputy treasurer why these lots were not offered for sale, and received from him the answer, that, "the taxes had been paid by Calvin Fisk." Witness then saw Fisk, and Fisk informed him he had not

bought the lots, nor paid the taxes. Witness gave the information to the deputy treasurer, but could obtain no satisfaction. The lots were never sold for the taxes of 1872, or 1873, but the taxes were all paid for these years by the treasurer, Harris, and the proper proportions of them were placed in the treasurer's books to the credit of the different funds, viz., state, county, city, school, etc. By the means detailed, the county treasurer sought to acquire a tax title to himself of the premises. He was detected in his improper practices, and defeated in accomplishing his purpose. On the 12th of November 1874, the tax certificate, wrongfully issued after the sales in 1873 had closed, was declared null and void. On the 10th July 1875, Milo R. Harris as county treasurer re-charged the taxes on the lots, and placed them upon the books as lands *unavoidably omitted* from the tax sales, and advertised the same for sale, to be sold on 7th of September 1875; and afterward, on 16th August 1875, Milo R. Harris, then county treasurer and the former deputy treasurer, re-funded to J. P. Harris the moneys paid by him when county treasurer for the taxes of 1872 and 1873 on the lots, and this was done without the knowledge or consent of plaintiff in error.

In my opinion the sale for the alleged taxes should have been perpetually enjoined by the district court, and the judgment refusing the injunction should be reversed. There was not within the purview of the law any *unavoidable omission or failure* to sell the lots for unpaid taxes of either 1872 or 1873. The treasurer for his own benefit intentionally failed to make either sale. Not only was free competition prevented, but no sale was allowed, so that not only did the treasurer put himself in a position as committing a fraud upon the law, but he went further and issued a tax certificate without the semblance of a sale. He acted upon the determination that no other person than himself should by any contingency obtain a tax certificate on the premises. Such conduct is strongly offensive to the judicial mind, and, to use a mild term, is highly censurable. Upon the payment of the taxes of 1872 and 1873, by the county treasurer, and the credit-

ing of the proper funds 'with the amounts due respectively to each on the books of the office, *all liens* for the taxes of said years were fully discharged. There had been a voluntary payment of all the taxes, with full knowledge of the facts in the case. The money had been duly received, the owner of the property made no objection; and before the attempt was made to re-charge the taxes on the premises the same were sold, on March 22d 1875, to an innocent purchaser. Under this view, the refunding of the taxes on August 16th 1875, to J. P. Harris, was without authority of law, and in no way militates against the position I take, that the taxes having once been paid there could be no legal re-charging of them on the lots, nor any tax sale for the same. The treasurer who refunded the money was a participant in all the transactions, and was bound in law to know the consequences of such a diversion of the public moneys. The taxes having been voluntarily paid, the books having been duly credited therewith, the lien therefor having been discharged, and there having been no *unavoidable omission* to sell the lots for any unpaid taxes, the county treasurer had no legal authority to re-charge the taxes of 1872 and 1873, in 1875, and the advertisement of a sale of the premises for the taxes already paid was beyond his power, and the proposed sale illegal and void.